In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00038-CR


______________________________




LOYD CRAIG, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 115th Judicial District Court


Upshur County, Texas


Trial Court No. 14,187




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 Loyd Craig was romantically involved with three women, Freda Cline, Rosie Brooks, and
Shaniqua Darden. Cline was shot while sitting in her car while Craig was present; the vehicle was
then set ablaze, incinerating the body; Brooks admitted she shot Cline at Craig's behest; Darden
insisted Craig was with her on the day of the homicide. After Brooks admitted shooting Cline, she
pled guilty and was sentenced to twenty-five years' imprisonment; she testified Craig planned and
directed the murder. Craig appeals his conviction for the murder of Cline after being convicted and
sentenced to sixty years' incarceration. We find: 1) the trial court did not err in overruling Craig's
Batson (1) challenge to three of the State's peremptory challenges at jury selection; 2) there was
sufficient evidence tending to connect Craig to Cline's murder to corroborate accomplice Brooks'
testimony; and 3) the trial court did not err in denying Craig's motion for new trial. We affirm the
judgment.

I. Batson Challenge

 Craig first argues the trial court erred in denying his challenge to the State's use of
peremptory strikes on three veniremembers. See id. A Batson challenge generally gives rise to a
three-step process. First, the defendant must make a prima facie case that a veniremember was
peremptorily excluded on the basis of race. Next, the State must come forward with race-neutral
reasons for the peremptory strike. Finally, the defendant has the opportunity to rebut the State's
explanations. The burden of persuasion remains with the defendant to prove purposeful
discrimination. In Purkett v. Elem, 517 U.S. 765 (1995), the United States Supreme Court explained
that "unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will
be deemed race neutral." Shuffield v. State, 189 S.W.3d 782, 785 (Tex. Crim. App. 2006). The trial
court determines whether the defendant has carried his or her burden of proving racial
discrimination. Mathis v. State, 67 S.W.3d 918, 924 (Tex. Crim. App. 2002). The trial court's
determination is accorded great deference; we will not overturn the determination unless it is clearly
erroneous. Chamberlain v. State, 998 S.W.2d 230, 236 (Tex. Crim. App. 1999). 

 A. Prima Facie Claims of Racial Discrimination and the State's Responses

 Craig told the trial court, "There were three black members on the first two rows, Jerry
Tennison, Shirley Hall, and Darrel Todd, and I noticed all three of them got struck." (2) We move to
the State's race-neutral explanations for its strikes. (3)

 1. Veniremember Tennison 

 The State inquired whether potential jurors could consider the whole range of punishment,
from community supervision to five to ninety-nine years or life in prison. The State said, "Mr.
Tennison, you cannot consider it?" The venireman answered, "Yes sir. I just raised it [his hand]
slow." 

 The State told the trial court Tennison "didn't raise his hand to a critical question until I
looked at him and then he raised his hand and said I was just late. That indicated to me that he
wasn't going to raise his hand to that question because he didn't do it until I specifically turned to
him." 

 Further, the State indicated that, "[H]is actions indicated to me that he wasn't going along
with that." 

 2. Veniremember Hall

 Regarding Hall, the State explained its strike as follows:

 THE COURT: Okay. What about Ms. Hall? 

 

 [State]: Ms. Hall, if you'll recall was the one that all during my voir dire she
sat there like you're standing, just like this.

 

 THE COURT: She was cold? 

 

 [State]: And -- but during [the defense] voir dire she wasn't.

 

 THE COURT: You warmed her up, Mr. Fetter. 

 

 [State]: Whatever, but she opened up to him.

 3. Veniremember Todd

 The State explained its strike of veniremember Todd:

 [State]: Mr. Todd was the one if you'll recall I asked the question about O. J.
Simpson and nobody raised their hand, but he was glaring at me and I made the point
of going back and saying, if you'll recall I did a follow-up are you sure and I was
looking directly at him because of his facial expression. He was mad at [sic] heck
at me for even asking that question and that's why he got struck.


 The issue for the trial court and the appellate court at this juncture is the facial validity of the
explanation given. Purkett, 514 U.S. at 768; Goode v. Shoukfeh, 943 S.W.2d 441, 445 (Tex. 1997). 
In evaluating whether the explanation offered is race neutral, a court must determine whether the
peremptory challenge violates the Equal Protection Clause as a matter of law, assuming the reasons
for the peremptory challenge are true. Goode, 943 S.W.2d at 445. A race-neutral explanation means
that the challenge was based on something other than the juror's race. Id. Unless a discriminatory
intent is inherent in the explanation, the reason offered will be deemed race neutral for purposes of
the analysis at step two. Id. We do not see a discriminatory intent in the State's three explanations
and therefore proceed to the next step.

 B. Defense Burden to Show Pretext

 Following the State's presentation of its race-neutral reasons for its peremptory strikes, the
defendant then bears the burden to convince the trial court that the State's reasons are pretexts for
racially discriminatory use of its strikes. The ultimate burden of proof of a Batson violation rests
with the defendant. Craig told the trial court, 

 Mr. Tennison, you know, he might have been slow in raising up but he answered the
question the same as everybody else. And Mr. Todd, you know, I don't remember the
glaring and all that stuff but -- nobody raised their hand up and thought O. J. was
innocent. You know, he didn't affirmatively make any statements or indicate that he
disagreed.


 Craig did not rebut the State's description of Hall as "cold." 

 Regarding Tennison, who the State said was late raising his hand to a question about
considering the full range of punishment, an inability to consider the full range of punishment is a
race-neutral reason for striking a veniremember. Chambers v. State, 866 S.W.2d 9, 24 (Tex. Crim.
App. 1993); (4) see also Yarbough v. State, 732 S.W.2d 86 (Tex. App.--Dallas 1987), vacated &
remanded on other grounds, 761 S.W.2d 17 (Tex. Crim. App. 1988). After asking the general
question to the panel if they could consider life imprisonment as a punishment in the proper murder
case, the attorney then stated, "Okay. Mr. Tennison you cannot consider it?" which suggests that
Tennison either did not raise his hand or as he stated was "slow" to do so. Craig's only answer was
that Tennison "answered the question the same as everybody else." However, Tennison's reaction
was apparently not the same as everyone else. Even though Tennison did not give an answer
indicating that he was hostile to the State, the State did identify Tennison's tardiness in answering
that he could consider a life sentence as a specific, objective reaction which the State interpreted as
some hesitancy to consider the entire range of punishment. We cannot determine that such an
interpretation was unreasonable or without foundation. 

 As for venireman Todd, the State said he was "mad at [sic] heck" and "glaring" at him when
the latter asked the panel whether anyone thought O. J. Simpson was innocent. Lack of eye contact
and attentiveness and no development of a back-and-forth relationship during voir dire has been
upheld as a race-neutral explanation. Townsend v. State, 730 S.W.2d 24, 26 (Tex. App.--Texarkana
1987, no pet.). So, too, where a potential juror was "very hostile" toward the prosecutor questioning
her, as demonstrated by "her facial expression, even body language, with her arms folded and
peering." Alexander v. State, 866 S.W.2d 1, 8 (Tex. Crim. App. 1993). The State's explanation for
striking Todd was race neutral. Craig responded to the State's explanation by saying, "I don't
remember the glaring and all that stuff but -- nobody raised their hand up and thought O. J. was
innocent. You know, he didn't affirmatively make any statements or indicate that he disagreed." The
defendant must do more than simply state his or her disagreement with some of the State's
explanations. The defendant must prove affirmatively that the State's race-neutral explanations were
a sham or pretext. Webb v. State, 840 S.W.2d 543, 544 (Tex. App.--Dallas 1992, no pet.);
Straughter v. State, 801 S.W.2d 607, 613 (Tex. App.--Houston [1st Dist.] 1990, no pet.). As for
Craig's statement to the trial court that "nobody raised their hand up and thought O. J. was innocent,"
there is no further discussion or questioning by either party with any other panel members on this
topic. 

 Statements about the demeanor or appearance of veniremembers must be judged for their
credibility by trial courts, whose findings must be reviewed deferentially by appellate courts. 
Yarborough v. State, 947 S.W.2d 892, 893 (Tex. Crim. App. 1997). Strikes based on claims not
easily verifiable through objective proof should be viewed with ''healthy skepticism,'' but, under this
view, the skepticism is to be exercised by the trial court, not by the appellate court. Moss v. State,
877 S.W.2d 895, 899 (Tex. App.--Waco 1994, no pet.) (appellate court owes deference to trial court
decision, which should be disturbed only if ''clearly erroneous''). 

 Craig offered no rebuttal to the State's race-neutral explanation for striking veniremember
Hall. A party's failure to offer any real rebuttal to a proffered race-neutral explanation can be fatal
to his or her claim. Johnson v. State, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002); Ford v. State,
1 S.W.3d 691, 694 (Tex. Crim. App. 1999) (defendant failed to rebut State's reason by
cross-examining prosecutor or offering rebuttal evidence).

 C. Trial Court Not Clearly Erroneous

 When reviewing a Batson objection, we examine the record in the light most favorable to the
trial court's ruling and reverse only when the ruling is clearly erroneous. Herron v. State, 86 S.W.3d
621, 630 (Tex. Crim. App. 2002). A ruling is clearly erroneous when, after searching the record, we
are left with the definite and firm conviction that the trial court has made a mistake. Goldberg v.
State, 95 S.W.3d 345, 385 (Tex. App.--Houston [1st Dist.] 2002, pet. ref'd); Bausley v. State, 997
S.W.2d 313, 315 (Tex. App.--Dallas 1999, pet. ref'd). The "clearly erroneous" standard "is a highly
deferential standard because the trial court is in the best position to determine whether a prosecutor's
facially race-neutral explanation for a peremptory strike is genuinely race-neutral." Gibson v. State,
144 S.W.3d 530, 534 (Tex. Crim. App. 2004). We may not substitute our opinion for the trial court's
factual assessment of the neutrality of the State's explanation for exercising strikes, and we focus on
the genuineness, rather than the reasonableness, of the State's asserted nonracial motive. Id. at 534
& n.5 (citing Purkett, 514 U.S. 765).

 Reviewing the record before us, we find the State presented racially neutral explanations for
the three challenged strikes. Based on Craig's limited rebuttals, we are not "left with the definite and
firm conviction that the trial court has made a mistake." We overrule Craig's first point of error.

II. Corroboration of Accomplice-Witness Testimony

 A conviction cannot be had on the testimony of an accomplice unless corroborated by other
evidence tending to connect the defendant with the offense committed; the corroboration is not
sufficient if it merely shows the commission of the offense. Tex. Code Crim. Proc. Ann. art. 38.14
(Vernon 2005). While required by neither common law nor our Federal and State Constitutions,
Article 38.14's codification reflects the Texas Legislature's determination that accomplice-witness
testimony implicating another "should be viewed with some level of caution." Gill v. State, 873
S.W.2d 45, 48 (Tex. Crim. App. 1994); see also Brown v. State, 159 S.W.3d 703, 707 (Tex.
App.--Texarkana 2004, pet. ref'd) (discussing covert witness rule of Article 38.141 and its parallels
to Article 38.14's accomplice-witness rule). Article 38.14 requires the corroboration of
accomplice-witness testimony, but there is no exact rule as to the amount of evidence required for
corroboration. Dowthitt v. State, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). "All that is required
is that there be some non-accomplice evidence which tends to connect the accused to the commission
of the offense alleged in the indictment." Gill, 873 S.W.2d at 48; cf. Jeffery v. State, 169 S.W.3d
439, 448 (Tex. App.--Texarkana 2005, pet. ref'd) (applying similar analysis for corroboration of
covert-witness testimony); Brown, 159 S.W.3d at 707-08. Such evidence may be either direct or
circumstantial. Reed v. State, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988).

 The test for weighing the sufficiency of corroborating evidence is to eliminate from
consideration the accomplice's testimony, and then examine the remaining testimony and evidence
to determine if there is evidence that tends to connect the defendant with the commission of the
offense. Munoz v. State, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); Reed, 744 S.W.2d at 125;
Hall v. State, 161 S.W.3d 142, 149 (Tex. App.--Texarkana 2005, pet. ref'd). The nonaccomplice
testimony does not have to directly link the accused to the crime, it alone need not establish guilt
beyond a reasonable doubt, and it need not prove all the elements of the alleged offense. Gill, 873
S.W.2d at 48; Munoz, 853 S.W.2d at 559; Reed, 744 S.W.2d at 126; Jeffery, 169 S.W.3d at 448. The
accused's presence at the scene of the crime is, by itself, insufficient to corroborate an accomplice's
testimony. However, "evidence that an accused was in the company of the accomplice close to the
time of the offense, coupled with other suspicious circumstances, may tend to connect the accused
to the offense." Gill, 873 S.W.2d at 49; see also Reed, 744 S.W.2d at 127; Jeffery, 169 S.W.3d at
447; Brown, 159 S.W.3d at 708. Moreover, while evidence that addresses only motive or
opportunity to commit the crime is, by itself, insufficient to corroborate the accomplice-witness
testimony, motive or opportunity evidence may be considered in conjunction with other evidence
tending to connect the accused to the crime. Reed, 744 S.W.2d at 127. "Cumulative evidence of
'suspicious circumstances' may be sufficient even if none of the circumstances would be sufficient
individually." Jeffery, 169 S.W.3d at 447; see also Brown, 159 S.W.3d at 708. In the end, every
case "must be considered on its own facts and circumstances--on its own merit." Munoz, 853
S.W.2d at 559; see also Reed, 744 S.W.2d at 126.

 A. Craig's Accomplice, Rosie Brooks

 Cline had been living with Craig until a few days before her death. Brooks testified that, two
days before the murder, she met with Craig and "someone had told him that Freda was out to get him
and that she was going to make him pay and he had asked me if I would shoot her and I told him that
I would." On the day of the murder, Brooks got Craig's truck from him. Craig and Cline were
together in a Dodge Intrepid. They all drove to Eric Harper's house, where Craig and Cline sat in
Cline's car in Harper's front yard. When Craig and Cline left, Brooks followed; she got the truck
stuck, and Craig called Harper, who came and extricated Brooks and the truck. Brooks testified she
followed Craig and Cline "through the country" to an area near Mule Deer and Minx Roads; Craig
was outside Cline's car, talking to Cline, who was seated in the driver's seat, when she began
apologizing for seeing other men. Brooks said that, at Craig's instruction, she got a pistol he had
behind his back. When Cline begged Craig to tell Brooks not to shoot her, Craig said it was not up
to him, it was up to Brooks. Brooks also said Craig told her that, if she did shoot Cline, to be sure
and shoot her in the head. After Brooks shot Cline, Craig then retrieved a jug of gasoline, which
Brooks had purchased at Craig's instruction, from the truck and told her to turn the truck around. 
Craig then poured the gasoline on Cline and her car and set them ablaze. Craig got in the truck with
Brooks, and they left. 

 Brooks acknowledged that, in her first statement to law enforcement officers, she stated Craig
was not with her at the time of the murder. 

 B. Nonaccomplice Testimony

 Setting aside Brooks' testimony, we now consider only other evidence which tends to connect
Craig to Cline's murder. Harper testified that, on the night now identified as the night of the murder,
Craig pulled into Harper's front yard in a vehicle that looked like Cline's Dodge Intrepid. There was
another person in the car with Craig, but Harper could not tell the person's race or gender. Harper
said Brooks parked in his yard Craig's blue Chevrolet truck she was driving. When the two vehicles
and their occupants then drove away from Harper's residence, Brooks got stuck; Craig called Harper,
and he came out and helped get the vehicle out. Cell phone records verify that several calls from
Craig's phone were made to Harper's phone on the night of the murder. These incidents corroborate
Brooks' testimony and tend to connect Craig to the events preceding the murder. 

 A few days later, Harper received a call from Craig asking him to meet with Craig at Craig's
mother's house. Craig asked Harper if he had heard what happened, to which Harper replied, "I think
so." Craig then told him "it" had happened that night, when Brooks and Craig were in the two
vehicles in Harper's yard. From the context of the questioning and testimony of this portion of the
reporter's record, "it" refers to the death of Cline. Harper said Craig told him the police might come
talk to Harper, and Craig had forgotten to tell the police he had been at Harper's house the night of
the murder. Craig told Harper that, if Harper told police Craig had been to Harper's house that night,
Craig would have to tell police he had forgotten to tell them he had been to Harper's. Harper testified
he got nervous and left. 

 In his written statement, Craig maintained he was with Darden at all times during the night
of the murder. However, in an oral statement given to investigators, and received in evidence, Craig
admitted he and Brooks drove up and down Mule Deer Road where Cline's burned car and remains
were found. Darden, at one time, told police Craig instructed her to tell them he was with her all day
on the day of the murder. (5) The State also introduced evidence Craig had dialed Cline's cell phone
111 times the day before the murder and only four times on the day of the murder (all four occurring
before 10:00 a.m.). Evidence that an accused was in the company of the accomplice close to the time
of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the
offense. Gill, 873 S.W.2d at 49. 

 There was sufficient evidence tending to connect Craig to Cline's murder; we overrule this
point of error. 

III. Motion for New Trial, Claiming Newly Discovered Evidence

 Craig's third point of error claims the trial court erroneously denied Craig's motion for new
trial. 

 Article 40.001 of the Texas Code of Criminal Procedure provides that "[a] new trial shall be
granted an accused where material evidence favorable to the accused has been discovered since
trial." Tex. Code Crim. Proc. Ann. art. 40.001 (Vernon 2006). Under that statute, a defendant is
entitled to have his or her motion for new trial granted if (1) the newly discovered evidence was
unknown to the defendant at the time of trial; (2) the failure to discover the new evidence was not
due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely
cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and
will probably bring about a different result in a new trial. Keeter v. State, 74 S.W.3d 31, 36-37 (Tex.
Crim. App. 2002).

 Not only does the decision to grant or deny such a motion fall within the sound discretion of
the trial court, subject to reversal only on a finding of an abuse of that discretion, but these motions
are generally disfavored by the courts and viewed with great caution. Fox v. State, 175 S.W.3d 475,
484 (Tex. App.--Texarkana 2005, pet. ref'd).

 Craig's amended motion for new trial claimed entitlement to relief because a newly
discovered letter, purportedly from accomplice Brooks to Craig's sister, implicated some other
unknown male and said Craig was not involved. In the letter, Brooks denied responsibility for
Cline's murder and said she was just at the scene and saw the murder. At the hearing, Craig's sister
Teresa Walton said she had received a letter from Brooks sometime in 2004, but put it in a plastic
bag with her other mail to be sorted later. She could not find it in time for trial, but did find it in
time for the hearing on the motion for new trial. (6) At the hearing, both Walton and Craig's other
sister, Pamela Allen, testified they were aware of the contents of the letter and had told both Craig
and his trial attorney of the letter and its contents, prior to the trial. This is fatal to Craig's appellate
point of error, as the new evidence relied on for a new trial must have been unknown to the
defendant at trial. See id. at 485. While we do not address whether the letter was admissible, we
point out that it would at most be available for the purpose of impeaching Brooks' trial testimony. 


 Further, even if the letter had been admitted into evidence at trial, it would be reasonable for
the trial court to conclude it was not probable that such evidence would bring about a different result. 
Undisputedly, Brooks at one time made statements that absolved Craig from all responsibility for
the murder and later changed her statement. Even if this letter was found to be authentic, it would
have added little to Brooks' previous testimony that Craig was not even present when the murder was
committed. That testimony was already before the jury, and Brooks' credibility was thoroughly
examined at the trial for this very reason. We overrule this point of error.

 We affirm the trial court's judgment.



 Jack Carter

 Justice


Date Submitted: December 4, 2007

Date Decided: January 10, 2008


Do Not Publish
1. Batson v. Kentucky, 476 U.S. 79 (1986).
2. The record is not clear regarding Craig's race. The United States Supreme Court held in
Powers v. Ohio, 499 U.S. 400 (1991), that, under the Fourteenth Amendment, "a criminal defendant
may object to race-based exclusions of jurors effected through peremptory challenges whether or not
the defendant and the excluded juror share the same race." Therefore, the race of a defendant is
irrelevant to a Batson challenge. Id. at 402; Cook v. State, 858 S.W.2d 467, 471 (Tex. Crim. App.
1993)
.
3. Where the State offers an explanation for the challenged strike and the trial court makes its
ruling, the issue of whether the defendant presented a prima facie case is moot. Hernandez v. New
York, 500 U.S. 352, 359 (1991).
4. Further, a prospective juror's inability to understand relevant legal concepts provides a
race-neutral explanation for exercising a peremptory strike. See Chiles v. State, 57 S.W.3d 512,
516-17 (Tex. App.--Waco 2001, pet. dism'd, untimely filed) (recognizing that prospective juror's
inability to understand the concepts of insanity defense and single-witness testimony constituted
race-neutral reason); Williams v. State, 939 S.W.2d 703, 706-07 (Tex. App.--Eastland 1997, no
pet.) (recognizing that prospective juror's inability to understand concept of "beyond a reasonable
doubt" constituted race-neutral reason). 
5. Darden gave two statements to the police. The first said that Craig had been with her from
the afternoon through the night of the murder; in her second statement, she refuted the first and said
Craig had told her what to say. At trial, Darden testified in line with her first statement and said she
had been threatened by law enforcement with loss of her children to Child Protective Services if she
did not give a story inculpating Craig. The interviewing officers testified they never made such
threats. 
6. The trial was December 4-6, 2006; the motion for new trial was heard February 13, 2007. 




ustify;text-justify:inter-ideograph;
mso-pagination:widow-orphan'> 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00038-CR

                                                ______________________________

 

 

                              CALVIN WAYNE BURNHAM,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 123rd
Judicial District Court

                                                             Panola County, Texas

                                                       Trial Court
No. 2005-C-0001

 

                                                   
                                               

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                            Memorandum Opinion by Justice Moseley








                                                     MEMORANDUM 
OPINION

 

            Calvin
Wayne Burnham was charged with four counts of aggravated sexual assault and
four counts of indecency with a child, his stepdaughter.[1]  Pursuant to a plea of guilty on all counts,
he was placed on deferred adjudication community supervision for a period of ten
years.  Burnham appeals the trial courts
subsequent revocation of community supervision, adjudication of guilt, and
resulting sentence of fifty years imprisonment for each aggravated sexual
assault and twenty years imprisonment for each count of indecency with a
child.  He claims that the trial court
erred in considering evidence resulting from a polygraph examination, erred in
adjudicating the Appellant guilty based on evidence received at a hearing that
had occurred over seven months earlier, and that the evidence was insufficient
to demonstrate he violated a condition of his community supervision.  We affirm the trial courts judgment.  

I.          Standard of Review 

            The
determination of an adjudication of guilt is reviewable in the same manner as
that used to determine whether sufficient evidence supported the trial courts
decision to revoke community supervision. 
See Tex. Code Crim. Proc. Ann. art. 42.12, § 5(b) (Vernon Supp.
2010).  While the decision to revoke
community supervision rests within the discretion of the trial court, it is not
absolute.  In re T.R.S., 115 S.W.3d 318, 320 (Tex. App.Texarkana 2003, no
pet.).  To revoke community supervision,
the State must prove every element of at least one ground for revocation by a
preponderance of the evidence.  Tex. Code Crim. Proc. Ann. art. 42.12,
§ 10 (Vernon Supp. 2010); T.R.S., 115
S.W.3d at 320; Johnson v. State, 943
S.W.2d 83, 85 (Tex. App.Houston [1st Dist.] 1997, no pet.).  Preponderance of the evidence has been
defined as the greater weight and degree of credible testimony.  T.R.S.,
115 S.W.3d at 320.

            In
a revocation hearing, the trial judge is the sole trier of the facts and
determines the credibility of the witnesses and the weight to be given to the
testimony.  T.R.S., 115 S.W.3d at 321; Lee
v. State, 952 S.W.2d 894, 897 (Tex. App.Dallas 1997, no pet.); Johnson, 943 S.W.2d at 85.  The judge may accept or reject any or all of
a witnesss testimony.  T.R.S., 115 S.W.3d at 321 (citing Mattias v. State, 731 S.W.2d 936, 940
(Tex. Crim. App. 1987)).  Considering the
unique nature of a revocation hearing and the trial courts broad discretion in
the proceedings, the general standards for reviewing sufficiency do not
apply.  Pierce v. State, 113 S.W.3d 431, 436 (Tex. App.Texarkana 2003,
pet. refd).  Instead, we review the
trial courts decision regarding community supervision revocation for an abuse
of discretion and examine the evidence in a light most favorable to the trial
courts order.  T.R.S., 115 S.W.3d at 321; Garrett
v. State, 619 S.W.2d 172, 174 (Tex. Crim. App. 1981); Pierce, 113 S.W.3d at 436. 
If the States proof is sufficient to prove any one of the alleged
community supervision violations, the revocation should be affirmed.  T.R.S.,
115 S.W.3d at 321 (citing Stevens v. State,
900 S.W.2d 348, 351 (Tex. App.Texarkana 1995, pet. refd)); Pierce, 113 S.W.3d at 436.

II.        Court Could Consider Evidence from
Hearing on First Motion to Adjudicate Guilt

 

            As
a preliminary matter, Burnham complains that the trial court improperly considered
evidence from a hearing on the States first amended motion to adjudicate
guilt, in which his competency was timely questioned.  At the beginning of the hearing, the trial
court appointed Dr. Frank S. Murphy to examine Burnham.  Due to the requested competency examination,
Burnhams counsel told the court he would not be able to go forward today and
requested a continuance of the hearing. 
The trial court granted the continuance, but allowed Kelly B. Hendricks,
the polygraph examiner, to testify because he had travelled 180 miles to attend
the hearing scheduled that day.  Counsel
was allowed to reserve objections to the testimony.  After the hearing, Dr. Murphy concluded that
Burnham was competent, but recommended treatment for bipolar disorder,
prompting agreement between Burnham and the State to reset the hearing for a status
evaluation at a later date.  Prior to
the status evaluation, the State filed a second amended motion to adjudicate
guilt.  

            Burnham
argues that the trial court erred in considering Hendricks testimony during
the hearing on the first motion to adjudicate, before resolving competency
issues.  To support his argument, Burnham
cites Rogers v. State.  640 S.W.2d 248 (Tex. Crim. App. [Panel Op.] 1981).  In Rogers,
the court found the trial court was without authority to subsequently revoke
community supervision in the absence of allegations or proof of subsequent
violations where it had previously decided to continue the defendant upon
community supervision.  Id. at 252 (op. on rehg); Rains v. State, 678 S.W.2d 308 (Tex.
App.Fort Worth 1984, pet. refd) (same). 
In other words, in the absence of other allegations, a trial court
cannot simply change its mind and revoke community supervision once it has
decided not to do so.  Here, because the
revocation hearing was reset pursuant to agreement, and the second amended
motion to revoke contained new allegations, Rogers
does not apply.  Bersuch v. State, 304 S.W.3d 547, 548 (Tex. App.Waco 2009, pet. refd).  

            Instead,
the Texas Court of Criminal Appeals has held that in a second revocation
hearing, a trial judge may take judicial notice of evidence obtained in a prior
revocation proceeding, provided that he presided over both hearings.  Torres
v. State, 595 S.W.2d 537 (Tex. Crim. App. [Panel Op.] 1980); see Cisneros v. State, 697 S.W.2d 718,
720 (Tex. App.Corpus Christi 1985, no pet.). 
The same trial judge presided over both motions to adjudicate
guilt.  Thus, the trial court did not err
in considering evidence obtained at the hearing on the first amended motion
when adjudicating guilt based on the States second amended motion.  

III.       Polygraph Results Are
Inadmissible 

            Because
of their inherent unreliability and tendency to be unduly persuasive, Burnham
is correct in reciting the rule that polygraph examination results are
inadmissible for any purpose in a criminal proceeding on proper objection.  See
Shiflet v. State, 732 S.W.2d 622, 630 (Tex. Crim. App. 1985).  

            There is a
question of whether Burnham failed to preserve the point of error.  Jasso
v. State, 112 S.W.3d 805, 81314 (Tex. App.Houston [14th Dist.] 2003,
pet. refd).  We note that Hendricks was
allowed to testify with the courts condition that counsel was able to reserve
objections.  When Burnhams counsel
specifically objected to the admissibility of the polygraph results, the trial
court stated, Again, Im just giving you, Counsel, an opportunity to see what
hes going to say.  . . . .  You can reserve your objections.  . . . . 
And Ill note it, and you can be subject to making objections at a later
time.  The results were received at
this time just for the limited purpose of [Hendricks] testimony.  

            At
the conclusion of the hearing on the second amended motion to adjudicate guilt,
in which the State did not offer the polygraph results, Burnhams counsel asked
to file a brief with the court addressing concerns that the second amended
motion contained allegations not heard at the hearing.  The judge referenced Hendricks testimony and
pointed out that he had heard nothing at the beginning of this that we were
having any objection to that evidence coming in.  He further stated, I was satisfied, since I
havent heard anything to the opposite, about the polygraph that was
administered and the admissions he made subsequent to that.  It is unclear whether the court treated the
results of the polygraph as admitted, and whether it treated counsels request
to file a brief as an objection to the results. 


            Nevertheless,
even assuming that the court erroneously admitted the polygraph results over
proper objection, because we hold below that the evidence was sufficient to
demonstrate violation of at least one condition of community supervision,
Burnham was not harmed by its admission. 
See Tex. R. App. P. 44.2(b); Anderson
v. State, 182 S.W.3d 914, 918 (Tex. Crim. App. 2006).  

IV.       Sufficient
Evidence Supported the Trial Courts Judgment 

            The
States second amended motion to adjudicate guilt claimed that Burnham violated
the following conditions of community supervision requiring him to:  maintain suitable employment; pay an assessed
$1,336.00 fine at a rate of $15.00 per month; pay community supervision fees of
$50.00 each month; submit to sex offender treatment; and commit to sex offender
registration requirements.  

            At
the hearing on the second amended motion to adjudicate guilt, administrative
deputy Heather Green testified that although Burnham was required to report any
change in job status [n]ot later than the 7th day after the date of the change,
he failed to do so.  Shelby and Panola
County community supervision officer Heather Brown stated Burnham was laid off
on December 3, 2008, and failed to provide income verification until
November 2, 2009, indicating Burnham had not worked in almost a year.[2]  She claimed Burnham was absent from sex
offender treatment meetings.[3]  Brown also testified Burnham had failed to
pay fines and community supervision fees pursuant to the courts order.  Without objection, the State admitted
documentation of Burnhams failure to pay, showing arrearages in each case of
between $75.00$185.00, totaling $1,140.00, and administrative notes suggesting
Burnham was sent several failure to pay notices.[4] 

            Most
importantly, the State also claimed that Burnham violated the conditions of
community supervision requiring him to:  avoid
injurious or vicious habits, including abstaining from the possession or use of
all intoxicating beverages and all unlawful possession of alcohol; refrain from
frequenting places where pornographic materials are sold; refrain from
possessing recorded materials for the purpose of deviant sexual arousal; avoid
contact with the victims family; and stay 500 feet from any school.  

            [T]he
result of a polygraph examination is the conclusion based on the machines
graphic indications as to whether the defendant was lying or telling the truth.
 Marcum
v. State, 983 S.W.2d 762, 766 (Tex. App.Houston [14th Dist.] 1998, pet.
refd) (citing Castillo v. State, 739
S.W.2d 280, 293 (Tex. Crim. App. 1987)). 
Statements made to a polygraph examiner during such an examination are
generally admissible.[5]  Id.;
Harty v. State, 229 S.W.3d 849, 851
n.2 (Tex. App.Texarkana 2007, pet. refd); see Shiflet, 732 S.W.2d at 623 (statements against interest made
while not in custody admissible).  

            Hendricks
testified that Burnham made several pre-test and post-test admissions.  Specifically, he admitted to: consuming wine
at Olive Garden, viewing cell phone instant message image photos of girls
sending pictures of their breasts and vaginas . . . about 20 to 30 times; frequenting
several area gas stations or convenience stores that display pornography; and
visiting his brothers house in the evening when school is out because his
brothers house is within 500 feet of a school.  The examiner testified Burnham shop[ped] at
the grocery store where the victims grandmother is the manager, but denied
speaking with her.  Burnham also claim[ed]
that he ha[d] a prescription for Hydrocodone, and admit[ted] possession of
crystal methamphetamine when he poured his dads crystal methamphetamine out on
the ground once whenever he was trying to help his dad get off crystal meth. 

            The
admissions to Hendricks were sufficient for the trial court to find, in its
discretion as sole fact-finder, that Burnham violated at least one condition of
his community supervision by a preponderance of the evidence.  See
T.R.S., 115 S.W.3d at 321.  Thus, we
affirm the revocation and adjudication of guilt.  Id.


V.        Conclusion

            We
affirm the trial courts judgment. 

 

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:         December
14, 2010

Date Decided:             December
15, 2010

 

Do Not Publish

 

 




 

OPINION
ON REHEARING

 

            In
the above-captioned case, we affirmed Calvin Wayne Burnhams conviction of four
counts of aggravated sexual assault and four counts of indecency with a child,
his stepdaughter.[6]  Burnham has moved that we rehear the matter,
alleging that the State violated Article 42.12, Section 21(b) of the Texas Code
of Criminal Procedure in amending its motion to adjudicate guilt after the
commencement of taking evidence at the hearing.[7]  Tex.
Code Crim. Proc. Ann. art. 42.12, § 21(b) (Vernon Supp. 2010). 

            To
recapitulate, the State filed its first amended[8]
motion to adjudicate guilt on May 13, 2009. 
Among other allegations, the first amended motion alleged Burnham
violated conditions of community supervision requiring him to:  avoid injurious or vicious habits, including
abstaining from the possession or use of all intoxicating beverages and all
unlawful possession of alcohol; refrain from frequenting places where
pornographic materials are sold; refrain from possessing recorded materials for
the purpose of deviant sexual arousal; avoid contact with the victims family;
and stay 500 feet from any school.  The
first amended motion to adjudicate stated that Burnham admitted to polygraph
examiner Kelly B. Hendricks that he had:  (1) consumed alcohol at an Olive Garden
restaurant; (2) possessed methamphetamine; (3) stopped at a grocery store where
the victims grandmother worked; (4) gone into gas stations and convenience
stores that displayed pornography; (5) reviewed cell phone instant message
photos of breasts and vaginas 20 to 30 times; (6) visited his brothers home,
which was within 500 feet of a local school; and (7) ingested Hydrocodone,
although he had previously reported to his community supervision officer that
he was not taking any medications.  

            At
the hearing on the first amended motion to adjudicate guilt on May 29, 2009,
Burnhams counsel raised issues of competency, and the trial court appointed
Dr. Frank S. Murphy to examine Burnham. 
The trial court granted a request for continuance made by Burnhams
counsel, but allowed the polygraph examiner to testify because he had travelled
180 miles to attend the hearing scheduled that day.  Counsel was allowed to reserve objections to
the testimony.  Dr. Murphy concluded
Burnham was competent, but recommended treatment for bipolar disorder.  At a setting on August 21, 2009, Burnham and
the State agreed to reset the hearing for a status evaluation at a later
date due to Burnhams mental health issues, and the trial court was not asked
to exercise its discretion to rule on the first amended motion.[9]  Prior to the status evaluation, the State
filed a second amended motion to adjudicate guilt, adding a single allegation
that Burnham failed to remain at his residence for the duration of Halloween
night, as required by his Halloween 2009 Guidelines Contract made a part of
his conditions of community supervision. 


            Article
42.12, Section 21(b) of the Texas Code of Criminal Procedure states that in no
event may the state amend the motion after the commencement of taking evidence
at the hearing.  Tex. Code Crim. Proc. Ann. art. 42.12, § 21(b).  Burnham complains on rehearing that the State
violated Section 21(b).  However, in
order for Burnham to have preserved this error for our review, he was required
to lodge a timely, specific objection in front of the trial court.  Tex. R. App. P. 33.1; Rogers, 640 S.W.2d at 263 (op. on second rehg); see Burns v. State, 835 S.W.2d 733, 735
(Tex. App.Corpus Christi 1992, pet. refd).[10]  We find this was not done. 

            During
the January 2010 hearing on the States second amended motion to adjudicate
guilt, Burnhams attorney Clement Dunn announced ready on Burnhams
behalf.  After evidence was presented and
concluded, the following transpired:  

            MR.
DUNN:  Your Honor, Im going to make an
unusual request, if I may.  Before the
Court makes a decision on adjudication, would the Court be willing to entertain
a brief that we would submit?

 

            THE
COURT:  Well, I dont see what -- from
the evidence Ive heard this morning, is there something you need to point out
to me?

 

            MR.
DUNN:  Well, there are several things
that I would point out.  And quite
frankly, to do the best job, perhaps to be of most service to the Court, I
would like a little bit of time to research a little bit of case law and be
able to --

 

            THE
COURT:  Well, what kind of --

 

            MR.
DUNN:  -- be able to articulate some of
these points a little better than I can right now.  

 

            .
. . .

 

            MR.
DUNN:  . . . . My concern focuses, Your
Honor, in part on coming into court today and having a hearing on what is
styled, I believe, a second amended motion, which was filed November 2nd of
2009 and, within that motion, there are allegations that were not heard
today.  There were previous hearings that
occurred before this motion was filed.  

 

            THE
COURT:  There certainly was.  I agree. 
I recall it.  I was here.  There was a polygraph expert here that gave
him a polygraph back in, I guess, May of last year that testified as to points
1 through, I guess -- what was it Mr. Davidson?  

 

            .
. . . 

 

            THE
COURT:  I think it was probably about
five or six . . . . I know you werent benefit of that, but I have heard
nothing at the beginning of this that we were having any objection to that
evidence coming in.  And of course, it
was in under previous counsel.  

            And
then, of course, to be frank with you, I think the State was trying their best
to try to help your client out in giving him another chance and getting some
counseling for this. . . . 

 

            THE
COURT:  . . . . I was satisfied, since I
havent heard anything to the opposite, about the polygraph that was
administered and the admissions he made subsequent to that. . . . Im going to
go ahead and pronounce judgment today. . . .

 

            The
court then advised if you point out something that we need to address on
guilt-innocence, then Ill be glad to reconsider that.  Dunn replied, Your Honor, I appreciate the
opportunity.  With that understanding for
appellate purposes if we ever get to that point, I might say that Ill defer
any objections and advise the Court of those in the next few days, if thats
acceptable.  No objections, briefs, or
motions regarding Section 21(b) were filed. 

            During
Burnhams sentencing, the court inquired, Do you have anything to say at this
time why the sentence should not be pronounced against you?  Dunn replied, We do not, Your Honor.  

            The
purpose of requiring timely, specific objections is to apprise the trial court
of a partys complaint and thereby afford the court an opportunity to rule at a
time when the error could have been avoided or corrected by the trial
court.  See Gibson v. State, 726 S.W.2d 129, 131 (Tex. Crim. App.
1987).  After receiving the second
amended motion to adjudicate guilt, Burnham did not file a motion to quash or
otherwise complain to the trial court that the State could not amend its motion
because evidence had already been received. 
Burnham also voiced no objection at the beginning of the hearing.  Instead, he announced that he was ready to
proceed, evidence was heard, and the parties rested before any complaint was
voiced.  Burnhams objection was too
general to raise the issue of a Section 21(b) violation to the trial
court.  Rather, it appears that the trial
court interpreted it as a complaint on the sufficiency of the evidence
presented at the hearing on the second motion to adjudicate guilt.  Thus, the record does not demonstrate an
express or implied ruling by the trial court finding that the State did not
violate Section 21(b) so that we can review the matter.  Also, Burnham did not file a motion to arrest
judgment or complain about the trial courts procedure in a motion for new
trial.  Therefore, we find Burnhams main
complaint in his motion for rehearing was not preserved.  It is overruled.[11]


            We
deny the motion for rehearing. 

 

 

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

 

Date: 
January 26, 2011

 

Do Not Publish











[1]Burnham
appeals from this cause number and judgments entered in cause numbers 06-10-00039-CR
through 06-10-00045-CR.  





[2]Burnham
argues that his condition of community supervision did not require him to
maintain suitable employment if searching for a job.  The condition required him to [m]aintain
suitable employment or educational/vocational status; [i]f unemployed and not a
student, comply with the instructions of the Supervision Officer concerning
employment search, education or training, including providing documentation of
such activities.  Though the officer
testified Burnham had tried to find employment, the court was free to
conclude his one-year hiatus from employment of any sort constituted
noncompliance with the condition. 

 





[3]After
Brown testified without objection that Burnham failed to attend sex offender
treatment classes, she was asked what dates he failed to attend.  Because Brown referred to the records to
determine these dates, Burnham lodged a hearsay objection for lack of direct
knowledge.  

 





[4]Burnham
argues that the trial court failed to establish that he was able to pay the
fines and fees.  Tex. Code Crim. Proc. Ann. art. 42.12, § 21(c) (Vernon Supp. 2010).  The record demonstrates Burnham was indigent
and was unemployed until November 2009.  

 





[5]Burnhams
counsel objected to any statements that were made to the examiner, although
the basis for the objection was not stated. 
He further lodged an objection that the examiners total testimony
[w]as a violation of Article 38.22. 
However, because submission to a polygraph examination pursuant to
conditions of community supervision is not a custodial interrogation, Article
38.22 does not apply.  Marcum, 983 S.W.2d at 766. 





[6]Burnham
appealed from this cause number and judgments entered in cause numbers 06-10-00039-CR
through 06-10-00045-CR.  

 





[7]Burnham
discussed Section 21(b) in reference to his point of error by emphasizing that
the trial court erred in adjudicating the Appellant guilty based on evidence
received at a hearing that had occurred over seven months earlier.  He argued that because the court should not
have considered the polygraph examiners testimony, there was no
evidence introduced on these matters during the hearing on the second amended
motion to adjudicate, and the additional allegation contained within the second
amended motion to adjudicate guilt should not have been considered, Burnham
should not have been adjudicated guilty. 
We disposed of this point of error in our original opinion by holding
that the trial court could consider evidence from the previous hearing.  Burnham now places emphasis on the filing of
the intervening motion to adjudicate guilt. 
On rehearing, we address Burnhams failure to preserve error on this
specific Section 21(b) objection.  

 





[8]An
original motion to adjudicate guilt was filed on April 3, 2009.  





[9]Burnham
also asks the Court to re-evaluate his point of error complaining that the
trial court erred in continuing, and then subsequently revoking, Burnhams
community supervision.  He cites the rule
that a trial court is without authority to later revoke community supervision
in the absence of allegations or proof of subsequent violations where it had
previously decided to continue the defendant on community supervision.  Rogers
v. State, 640 S.W.2d 248 (Tex.
Crim. App. [Panel Op.] 1981); Rains v.
State, 678 S.W.2d 308 (Tex. App.Fort Worth 1984, pet. refd).  We pointed out, in our original opinion, that
the first amended motion to adjudicate guilt was reset pursuant to agreement,
and the trial court was not asked to exercise its discretion to make a finding
as to whether Burnham violated his community supervision.  We also stated that because the second
amended motion to adjudicate guilt contained new allegations, Burnhams cited
cases did not apply.  Bersuch v. State, 304 S.W.3d 547, 548
(Tex. App.Waco 2009, pet. refd).  

 





[10]See also Falana v. State, No.
02-07-00065-CR, 2007 WL 4292390, at *4 n.7 (Tex. App.Fort Worth Dec. 6, 2007,
no pet.) (not designated for publication) (citing Anderson v. State, Nos. 05-00-01700-CR, 05-00-01701-CR,
05-00-01702-CR, 2001 WL 1346309, at *2 (Tex. App.Dallas Nov. 2, 2001, no pet.)
(not designated for publication)); Brietzke
v. State, No. 04-99-00518-CR, 2000 WL 682564, at *2 (Tex. App.San Antonio
May 17, 2000, no pet.) (not designated for publication); Peña v. State, No. 04-98-00546-CR, 1999 WL 107068, at *2 (Tex.
App.San Antonio Mar. 3, 1999, pet. refd) (not designated for
publication).  Although these unpublished
cases have no precedential
value, we may take guidance from them as an aid in developing reasoning that may be employed.  Carrillo v. State, 98 S.W.3d 789, 794 (Tex. App.Amarillo
2003, pet. refd).  





[11]Moreover,
the rationale for Section 21(b) is to prevent the State from adding new or
different grounds for revocation as a result of evidence adduced at the hearing
on that particular motion.  Washington v. State, 731 S.W.2d 648, 649
(Tex. App.Houston [1st Dist.] 1987, no pet.); Johnson v. State, 633 S.W.2d 687, 689 (Tex. App.Amarillo 1982,
pet. refd)).  Even if this Court had
concluded that error was preserved, we would next determine it was
harmless.  OHara v. State, 626 S.W.2d 32, 35 (Tex. Crim. App. [Panel Op.] 1981).  Both the first and second motions to
adjudicate were based upon the same admissions made by Burnham to
Hendricks.  The only additional
allegation in the second amended motion to adjudicate revolved around Burnhams
failure to remain in his home on the night of October 31, 2009.  This occurrence took place several months
after Hendricks testimony.  Thus, the
States amended motion was not based upon evidence adduced at the revocation
hearing where Hendricks testified.  Thus,
any error would have been harmless.